**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**CASE NO. ______________**

DEMETRIUS HARVEY AND MEGHAN HARVEY, EACH INDIVIDUALLY AND AS NEXT FRIENDS TO AD.H., PA.H., PR.H., AND AS.H.,

Plaintiffs,

v.

THE MICHAELS ORGANIZATION, LLC, AMC East Communities, LLC, and MMS Air Force, LLC,

Defendants.
____________________________________________/

**COMPLAINT**

Plaintiffs, Demetrius Harvey, a Master Sergeant in the United States Air Force stationed at MacDill Air Force Base in Tampa, Florida ("MacDill"), and his family, Meghan Harvey, Ad.H., Pa.H., Pr.H., and As.H., suffered personal injuries because they lived in unsafe and unhealthy conditions while in privatized on-base military housing provided and managed by Defendants. Defendants' acts and omissions with respect to their operation, management, and maintenance of Plaintiffs' housing, as detailed in this Complaint, led directly to the unsafe and unhealthy conditions of their residence. Moreover, Defendants concealed these conditions from Plaintiffs through

false and misleading statements and the failure to disclose known hazards. When these conditions were discovered, Defendants failed to properly repair and remediate them. Plaintiffs bring this action to hold Defendants accountable for their acts and omissions.

## THE PARTIES

1. Plaintiffs DEMETRIUS HARVEY and MEGHAN HARVEY resided at MacDill Air Force Base in Tampa, Florida at all times relevant to this Complaint. DEMETRIUS HARVEY and MEGHAN HARVEY are the parents of Plaintiffs Ad.H., Pa.H., Pr.H., and As.H.

2. Defendant THE MICHAELS ORGANIZATION, LLC ("Michaels" or "The Michaels Organization") is a New Jersey limited liability company with its principal place of business at 2 Cooper Street, Camden, New Jersey 08102. Michaels is registered to do business in Florida.

3. Defendant AMC EAST COMMUNITIES, LLC ("AMC") is a Delaware limited liability company with its principal place of business at 2 Cooper Street, Camden, New Jersey 08102. AMC is listed as the "Owner" on the lease signed by the Plaintiffs.

4. Defendant MMS AIR FORCE, LLC ("MMS") is a New Jersey limited liability company with its principal place of business at 2 Cooper Street, Camden, New Jersey 08102. MMS is registered to do business in Florida. MMS has acted as property manager with respect to MacDill housing at all times relevant to this complaint.

5. Non-defendant HARBOR BAY AT MACDILL ("Harbor Bay") is the entity through which Defendants conducted many of the leasing, management, and

maintenance activities relating to military housing at MacDill. Upon information and belief, it presents itself as the landlord, appearing as the "Landlord/Lessor" on the lease Addenda, even though Defendant AMC is the owner or the lessor on the leases and Michaels Management Services, Inc. is identified as the Property Manager. Despite conducting extensive business operations in Florida, Harbor Bay is not a registered entity with the Florida Department of Corporations.

6. In related litigation, *Mullins et al. v. The Michaels Organization, LLC, et al.*, Case No. 8:25-cv-02637-SDM-AAS (M.D. Fla.), Defendant AMC represented that Harbor Bay is a "common or trade name" of Michaels and not a distinct legal entity. Plaintiffs allege the same upon information and belief. On information and belief, Defendants jointly manage, operate, and maintain MacDill military housing and are jointly responsible for the acts and omissions of Harbor Bay. Allegations concerning Harbor Bay therefore constitute allegations concerning Defendants.

**JURISDICTION AND VENUE**

7. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331. The acts and omissions underlying Plaintiffs' claims occurred on a federal enclave, MacDill Air Force Base, over which the United States was ceded exclusive federal legislative jurisdiction in 1950. Plaintiffs are aware of no developments since 1950 that have had the effect of changing MacDill's status as an exclusive federal enclave. Because the acts and omissions giving rise to Plaintiffs' claims occurred on an exclusive federal enclave, Plaintiffs' claims are governed by federal law under the Federal Enclave Doctrine for purposes of subject-matter jurisdiction. *See Mater v. Holley*, 200 F.2d

123, 124 (5th Cir. 1952).

8. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to Plaintiffs' claims occurred within this District on the federal enclave at MacDill where Plaintiffs were exposed to the conditions at issue.

9. This Court has personal jurisdiction over Defendants because their acts and omissions—carried out directly and/or through their agents and alter-egos—caused the harms complained of herein which occurred at MacDill. FLA. STAT. §§ 48.193(1)(a)(2),48.193(1)(a). Defendants also derived substantial revenue, directly or indirectly, from services provided to persons in Florida.

## FACTUAL ALLEGATIONS

### The Military Housing Privatization Initiative

10. In 1996, Congress enacted the Military Housing Privatization Initiative ("MHPI"). 141 Cong. Rec. S18853. The MHPI was intended to improve housing for service members and their families by allowing private housing companies to use their resources and expertise in improving existing military housing and new military housing.

11. Under the MHPI, a private contractor is granted a long-term lease of military base grounds. The private contractor is responsible for constructing new homes and renovating existing homes and then leasing, operating, managing, and maintaining the housing. The government also typically pays the contractor the full Basic Allowance for Housing ("BAH") to which the service member who rents the home is entitled. In addition, MHPI contractors typically receive performance incentive fees,

payable by the military department based on performance objectives, which include maintenance practices and resident satisfaction.

12. In response to concerns about dangerous, unsafe, and unhealthy conditions at MHPI housing, the 2020 National Defense Authorization Act created an MHPI Tenant Bill of Rights. The Tenant Bill of Rights specifies that military families have the right to reside in a housing unit that meets applicable health and environmental standards. They have the right to receive property management services that meet or exceed industry standards and that are performed by professional customer service and maintenance staff. 10 U.S.C. § 2890. Defendants purport to embrace the Tenant Bill of Rights and to incorporate its protections into their MHPI programs and activities.

13. Landlords are required to provide a housing unit that meets "minimum health, safety, and welfare standards set forth in Federal, State, and local law" and, if a walkthrough prior to move in indicates that those standards are not met, "remediate any issues and make any appropriate repairs[.]" 10 U.S.C. § 2891a(4).

**MHPI Housing at MacDill**

14. In November 2007, AMC East, LLC and the United States Air Force entered into a 50-year lease to privatize military housing at MacDill AFB. In 2021, Michaels acquired the assets of AMC East, LLC and AMC. Michaels, either directly or through its subsidiaries or affiliates, assumed all obligations, as the MHPI contractor, including but not limited to obligations under the ground leases, operating agreements, property management agreements, and residential leases.

15. Plaintiffs paid their BAH to AMC. In addition, the Air Force pays Defendants for management and maintenance of the property. These payments consist of (1) a monthly base fee and (2) an incentive fee payment upon achieving certain performance criteria. To obtain the incentive fee, Defendants submit documentation and a statement that they satisfied performance criteria, including objectives related to maintenance work orders and customer satisfaction.

16. Language in the Operating Agreement indicated that the Agreement was intended to further the MHPI's goal of benefiting residents of MacDill military housing.

**Defendants' Joint and Integrated Approach to MacDill Housing**

17. Defendants are members of the Michaels conglomerate, at the top of which sits Michaels. Defendants function as an integrated enterprise in their operation of MacDill housing.

18. With respect to its activities at MacDill, on information and belief, Michaels operates independently and through entities, including Defendants AMC and MMS and non-defendant Harbor Bay.

19. The Michaels webpage showcases its involvement in military housing and points to MacDill as one location of its "[q]uality housing from Coast to Coast." Moreover, employees whose e-mail addresses and signature blocks suggest that they are employed by Michaels regularly work with residents at MacDill, including on leasing and maintenance issues.

20. Defendants were bound in agency and alter-ego relationships in leasing,

operating, managing, maintaining, and repairing the homes at MacDill.

**The Unsafe and Unhealthy Housing Conditions at MacDill**

21. Defendants have long known about mold problems at MacDill. Military families have for years submitted complaints about mold and health issues caused by exposure to mold. The standard lease contains warnings about moisture and mold. The Resident Guidelines and Community Handbook stress the need to immediately report signs of leaks, moisture, or mold.

22. For example, upon information and belief, Defendants were aware that numerous homes lacked vapor barriers between the first floor and outdoors or contained defective vapor barriers. This allowed unsafe amounts of moisture to enter the homes. Additionally, the air conditioning units in numerous homes lacked secondary drain lines, causing water to leak into homes.

23. Harbor Bay refused to follow its mold policies, despite knowing that failure to do so would lead to the growth of toxic mold.

**The Harvey Family**

24. Master Sergeant (MSgt) Demetrius Harvey, United States Air Force ("USAF"), his spouse, Meghan Harvey, and their minor children, Ad.H., Pa.H., Pr.H., and As.H., resided at 1837 Billy Mitchell Loop, MacDill.

25. MSgt Harvey entered into a lease with Defendants prior to moving into the residence. Plaintiffs' lease listed AMC as the Owner and Harbor Bay at MacDill, the successor in interest to Michaels Management Services, Inc., as the Community Manager and Property Manager. Plaintiffs' lease provided that Florida law applied.

26. Plaintiffs' lease represented that, prior to moving in, the home was in safe, clean, and habitable condition and free of mold, mildew, and signs of water intrusion.

27. Defendants either knew these representations were false or made them without any reasonable basis to know whether they were true, with the intent to induce Plaintiffs to accept the residence. The Harvey family reasonably relied on those representations in accepting the residence and would not have moved into the home had they known its true condition.

28. During their tenancy, Plaintiffs came into contact with pests, ingested, and inhaled mold, experienced elevated interior moisture and water intrusion, and suffered personal injuries due to the unsafe and unhealthy conditions described in this Complaint.

29. From the time the Harvey family took possession of the residence, they encountered conditions suggesting the home had not been adequately prepared for occupancy. Upon entry, the family immediately noticed a foul odor and visible animal droppings consistent with a pest infestation. The Harveys requested that the carpeting throughout the residence be replaced because of its condition, but Harbor Bay replaced only the carpet in the storage area beneath the stairs.

30. Shortly after move-in, squirrels infiltrated the attic and ceiling cavities of the residence. The Harveys repeatedly reported the infestation to Harbor Bay, but the condition persisted for approximately six months before meaningful action was taken. When Harbor Bay eventually sealed an animal entry point, dead squirrels remained

inside the attic, causing a persistent rotting odor within the home.

31. The family experienced recurring water intrusions in the home, with leaks appearing in the dining-room ceiling, around windows, and through or near the HVAC vents. In connection with these conditions and the related repair efforts, the Harveys were displaced from their home for weeks at a time, on three different occasions.

32. The water intrusion recurred repeatedly, amounting to at least seven separate incidents. Despite the recurring nature of these conditions, Harbor Bay repeatedly closed the family's maintenance requests as "completed" without permanently identifying or correcting the source of the water intrusion. In one instance, Defendants text messaged MSgt Harvey stating that work order #121159-1 had been completed, and that the discoloration on the dining-room ceiling had simply been "painted over as no moisture was detected."

33. When the Harveys raised concerns about visible mold growth associated with the leaks and moisture, Harbor Bay maintenance personnel minimized the conditions, characterizing visible growth as "dust" or "mildew." Defendants have in their possession, custody, or control the identities of the Harbor Bay maintenance personnel who made these representations. Harbor Bay technician Gamalier Robles, known as "Gumby," advised the family that identifying mold was outside the maintenance technicians' authority, and that they were restricted from documenting a condition as mold.

34. On August 27, 2024, the family reported a mildewy smell from the air

conditioning, water leaks, and outlet covers separating from the walls; Harbor Bay promised a same-day response but did not appear, and again failed to appear for a rescheduled visit two days later. When a technician did respond in September 2024, he cleaned mildew from a bathroom vent and sprayed an air-purifying solution in several rooms, but the mildew remained where it had been "cleaned."

35. On or about September 13, 2024, following inspections by Harbor Bay maintenance and InDepth Environmental, Inc.—a third-party environmental contractor retained by Defendants—Spencer Teller II, The Michaels Organization Facilities Director, informed the family that displacement was necessary "due to the high amount of moisture and mold found throughout the house." Mr. Teller represented that the home would receive new air ducts, a new air-conditioning unit, and new appliances.

36. The family was displaced to Temporary Lodging Facilities on or about September 18, 2024—their fourth displacement—and remediation did not begin until September 24, 2024. The displacement lasted approximately eight and a half weeks and was marked by ever-shifting return dates. Julia Williams, The Michaels Organization Operations Coordinator, provided contradictory statements about the scope of the work, how long repairs would last, and sent status updates only to MSgt Harvey, despite the fact that he was deployed.

37. Harbor Bay contractors failed to establish proper containment. Containment barriers failed during the work, allowing construction dust and a persistent white residue to spread throughout the residence and onto the family's personal belongings.

The residue coated furniture, a piano, rugs, curtains, décor, shelving, and other household items, resulting in significant property damage.

38. The Harveys also reported electrical hazards within the residence. When Mr. Robles evaluated one electrical outlet, he advised the family that he could not safely perform the repair and referenced a prior fire related to that outlet.

39. On November 7, 2025, independent mold testing documented significant fungal contamination within the residence, including within the home's HVAC system and on interior surfaces, that far exceeded outdoor control levels. Both HVAC samples contained Penicillium/Aspergillus-type spores, known toxic molds. These findings documented fungal amplification within the air-distribution system serving the family's residence.

40. The conditions persisted into 2026. As late as January 2026, water intrusion was still recurring, and Harbor Bay maintenance technician Luis Figueroa responded to visible growth by spray-painting over it rather than investigating and correcting the source of the condition.

41. Throughout their residency, members of the Harvey family experienced significant physical and emotional harm—including hospital visits, chronic pain, emotional distress, and substantial psychological harm. Meghan Harvey experienced restless leg syndrome, bronchitis, vision loss and changes, hair loss, a rash on her knuckles and fingers, heart palpitations, gastrointestinal issues, chronic fatigue, brain fog, headaches, anxiety, and irritability. MSgt Demetrius Harvey experienced persistent throat mucus; irregular, frequent, and bloody bowel movements, periodic headaches,

difficulty sleeping, congestion and mucus build-up, bladder problems, joint pain, snoring, anxiety, irritability, and a loss of motivation. Pr.H. experienced headaches, vision changes, and facial eczema. Ad.H. experienced congestion and recurrent ear infections. Pa.H. experienced vomiting, unexplained leg pain, congestion, difficulty sleeping, irritability, and a cyst on the wrist. As.H. experienced rashes on the legs and fingers, painful menstrual cycles, stomach problems, headaches, chronic fatigue, anxiety, and depression.

42. The Harvey family also sustained substantial property losses as a result of the conditions within the residence and the failed containment during remediation. Furniture, a piano, rugs, curtains, décor, shelving, and other personal belongings were contaminated or damaged, including items coated by the persistent white residue that the family was unable to remove.

43. The Harvey family came into contact with and inhaled or ingested mold and other hazardous substances and suffered physical injuries, emotional distress, property damage, financial losses, and other damages as a direct result of Defendants' acts and omissions. Had the Harvey family known the true nature and extent of the pest infestation, recurring water intrusion, mold contamination, and other hazardous conditions within the residence, they would not have moved into or remained in the home. They continue to worry about the long-term consequences of their exposure.

44. Notwithstanding MacDill's status as a federal enclave, those of Plaintiffs' claims that seek recovery for personal injuries (including physical and emotional injuries) are governed, under 28 U.S.C. § 5001(b), by contemporary Florida law.

Contemporary Florida law also governs Plaintiffs' claims because all of those claims arise out of Plaintiffs' injuries suffered as a result of Defendants' acts and omissions in leasing, managing, and maintaining the home Plaintiffs leased from Defendants, and Plaintiffs' lease contains a choice of law provision selecting contemporary Florida law.

## CAUSES OF ACTION

### COUNT I: Breach of Contract (against Defendant AMC)

45. Plaintiffs incorporate the allegations set forth in paragraphs 1–44.

46. Plaintiffs had a valid lease with AMC. AMC owed contractual obligations to Plaintiffs to provide and maintain habitable housing and remedy leaks, moisture, mold, and other issues. Plaintiffs have complied with all obligations under the lease.

47. AMC failed to comply with the material terms of the lease by failing to ensure Plaintiffs' house was fit for human habitation and by failing to timely and adequately repair and remedy the conditions of the premises.

48. As direct and foreseeable results of AMC's breaches, Plaintiffs suffered physical, psychological, emotional, and financial harm. As direct and foreseeable results of AMC's breaches, Plaintiffs suffered substantial actual damages, including personal and property damages, financial damages, damages that require medical monitoring, and attorneys' fees and costs.

### COUNT II: Negligence (against all Defendants)

49. Plaintiffs incorporate the allegations set forth in paragraphs 1–44.

50. Defendants owed a duty to Plaintiffs to exercise reasonable care in the operation, management, maintenance, and repair of their home. Defendants negligently failed to meet the standard of care in performing those duties.

51. As the property owner and lessor of Plaintiffs' home, AMC owed Plaintiffs a duty to maintain their home in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care.

52. As property manager for Plaintiffs' MacDill home, Defendants owed a duty to Plaintiffs to maintain the premises in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care. In addition, on information and belief, as the operators of Harbor Bay, which managed and performed maintenance on the home, Defendants owed a duty to Plaintiffs to maintain the premises in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care.

53. Defendants' acts and omissions in performance of their duties as Plaintiffs' lessors, landlords, and property managers fell far below the standard of care owed to Plaintiffs under Florida law.

54. Defendants' acts and omissions breached the duty of reasonable care owed to Plaintiffs by failing to ensure that Plaintiffs' home was safe and fit for habitation.

55. Defendants breached the duty to exercise ordinary care in multiple respects, including: (a) failure to prepare the residence for occupancy; (b) delivering a home with a foul odor, animal droppings, and a pest infestation while replacing only the storage-area carpet; (c) failure to timely abate the squirrel infestation in the attic and ceiling cavities; (d) failure to reasonably repair and remediate the recurring water intrusion; (e) repeatedly closing maintenance requests as "completed" without identifying or correcting the source of the problem; (f) minimizing visible mold as "dust" or "mildew" and spray-painting over visible growth rather than investigating and correcting it; (g) failing to establish or maintain adequate containment during remediation, allowing construction dust and a persistent white residue to spread throughout the home and onto the family's belongings; (h) failing to address electrical hazards; (i) failing to relocate the family on a timely basis, resulting in four separate displacements; (j) use of untrained and/or unlicensed workers to repair and remediate Plaintiffs' home; (k) failure to hire and/or train competent employees to properly repair and remediate Plaintiffs' home; (l) failure to exercise reasonable care to select, employ, instruct, and/or supervise competent and careful contractors to perform work in Plaintiffs' home involving a risk of physical harm unless skillfully and carefully performed and/or to perform any duty which the Defendants owed to third persons; and (m) leaving the underlying moisture and mold conditions unresolved, as documented by November 2025 testing showing HVAC-plenum mold far exceeding outdoor levels.

56. Defendants engaged in additional safety violations and breaches of the duty of care to be determined upon discovery.

57. Defendants knew or should have known that maintenance failures had compromised the safety of Plaintiffs' home.

58. As a direct and proximate result of Defendants' negligence, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial harm, and damages that will require medical testing/monitoring, as well as severe mental and emotional distress related to those physical injuries.

**COUNT III: Gross Negligence**
**(against all Defendants)**

59. Plaintiffs incorporate the allegations set forth in paragraphs 1–44.

60. Defendants owed a duty to Plaintiffs to exercise reasonable care in the operation, management, maintenance, and repair of their home at MacDill. Defendants' conduct fell grossly below the applicable standard of care. Moreover, Defendants were recklessly indifferent to the consequences of their acts and omissions and failed to demonstrate even the slight diligence that a reasonable landlord or property manager would have exercised under the same or similar circumstances.

61. As the owner and lessor of Plaintiffs' home, AMC owed Plaintiffs a duty to maintain Plaintiffs' home in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care.

62. As property manager for Plaintiffs' home, Defendants owed a duty to Plaintiffs to maintain the premises in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care. In addition, on information and belief, as the operators of Harbor Bay, which

managed and performed maintenance on the home, Defendants owed a duty to Plaintiffs to maintain the premises in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care.

63. Defendants were aware that circumstances in Plaintiffs' home constituted an imminent or clear and present danger amounting to more than normal or usual peril with tenants often complaining to Defendants of mold and illnesses.

64. Defendants' acts and omissions fell grossly below the standard of care owed to Plaintiffs, and exhibited a conscious disregard for the consequences of their behavior, in multiple respects, including: (a) delivering and maintaining a home with a pest infestation, recurring water intrusion, and mold; (b) minimizing visible mold growth as "dust" or "mildew"; (c) concealing visible growth by painting over it rather than investigating or repairing it; (d) repeatedly closing recurring water-intrusion requests as "completed" without correction; (e) failing to warn Plaintiffs that they were being exposed to toxic mold; (f) conducting remediation without adequate containment, spreading a persistent white residue throughout the home; (g) leaving electrical hazards unaddressed despite a referenced prior fire; (h) use of untrained and/or unlicensed workers to repair and remediate Plaintiffs' home; (i) failure to hire and/or train competent employees to properly repair and remediate Plaintiffs' home; (j) failure to exercise reasonable care to select, employ, instruct, and/or supervise competent and careful contractors to perform work in Plaintiffs' home involving a risk of physical harm unless skillfully and carefully performed and/or to perform any duty which the Defendants owed to third persons; and (k) engaging in additional safety violations and

breaches of the duty of care to be determined upon discovery.

65. Each of the Defendants' reckless indifference to the rights of Plaintiffs is equivalent to an intentional violation of them.

66. As a direct and proximate result of Defendants' gross negligence, the Plaintiffs suffered substantial damage to their personal property, physical injuries, financial harm, and damages that will require medical testing/monitoring, as well as severe mental and emotional distress related to those physical injuries.

**COUNT IV: Omitted**

**COUNT V: Negligent Infliction of Emotional Distress**
**(against all Defendants)**

67. Plaintiffs incorporate the allegations set forth in paragraphs 1–44.

68. By their acts and omissions, Defendants caused Plaintiffs to be exposed to and come into direct physical contact with pests, mold and mold-contaminated conditions within their home.

69. As a result of that physical contact and exposure, Plaintiffs suffered physical injury, including, but not limited to, respiratory illness, allergic reactions, skin conditions, and other bodily harm.

70. As a direct consequence of these physical injuries, Defendants caused the Plaintiffs to suffer severe emotional distress, including worry, anxiety, anguish, suffering, and grief. Plaintiffs suffered additional physical injuries as a result of the emotional distress.

71. Plaintiffs' claims for emotional distress arise directly from physical

impacts and resulting physical injuries caused by Defendants' conduct. Each Plaintiff sustained direct physical contact with toxic mold within the home, and the members of the family suffered resulting physical injuries, including such conditions as respiratory illness, allergic reactions, skin conditions, and other bodily harm documented in this Complaint. Plaintiffs' emotional distress arises from, and is accompanied by, physical manifestations and injuries.

72. Defendants knew or should have known that Plaintiffs' home was unsafe to reside in, and that exposure to and contact with mold would inevitably occur and would result in physical harm to Plaintiffs.

73. As a direct result of Defendants' negligence and gross negligence, Plaintiffs came into physical contact with mold.

74. Plaintiffs suffered severe emotional distress as a result of that unhealthy and dangerous contact. Plaintiffs suffered physical injury as a result of the emotional distress.

75. Defendants are liable for the consequences that they knew or should have known would occur because of their negligent conduct.

76. Plaintiffs have suffered, are suffering, and will continue to suffer severe emotional distress and associated harms because of Defendants' acts and omissions.

**COUNT VI: Intentional Infliction of Emotional Distress**
**(against all Defendants)**

77. Plaintiffs incorporate the allegations set forth in paragraphs 1–44.

78. Defendants intentionally and knowingly subjected Plaintiffs to housing

conditions that were unsafe and unhealthy.

79. Defendants also recklessly misled Plaintiffs into moving into a home that they knew was dangerous and unfit for human habitation. Defendants then deceived the Plaintiffs into remaining in their home by falsely claiming that they would eliminate those dangers.

80. This intentional conduct, which subjected Plaintiffs to risk of serious injury or illness over a prolonged period, was extreme and outrageous.

81. Intentionally subjecting the Plaintiffs to such dangerous conditions and taking actions to ensure their continued exposure, is beyond all possible bounds of decency and intolerable in a civilized community.

82. This conduct caused severe emotional distress, as Plaintiffs suffered serious injuries and watched their loved ones get sick, and eventually understood that they were constantly in grave danger in their own home.

83. Plaintiffs suffered emotional and physical injury due to their severe emotional distress.

**COUNT VII: Breach of the Warranty of Habitability**
**(against Defendant AMC)**

84. Plaintiffs incorporate the allegations set forth in paragraphs 1–44.

85. AMC breached express and implied warranties of habitability.

86. AMC owed Plaintiffs a duty to provide them with habitable living conditions, under FLA. STAT. § 83.51, including but not limited to a duty to exercise reasonable care in the operation, inspection, management, and maintenance of Plaintiffs'

home. AMC failed to meet the standard of care in performing those duties. In their lease, AMC warranted that the housing it provided was safe, habitable, and free from defects.

87. AMC failed to live up to its duty to inspect the Plaintiffs' home prior to their moving in, in order to make necessary repairs, and transfer them to a reasonably safe home.

88. After Plaintiffs moved in, AMC did not reasonably maintain the home to meet the ordinary and normal standards of fitness. The presence of moisture and mold in Plaintiffs' home was a dangerous condition that AMC should have remediated.

89. As a result of AMC's breach of the express and implied warranties of habitability, Plaintiffs suffered substantial physical injuries and damage as well as harm to their personal property and other financial harm. Plaintiffs also suffered severe mental and emotional distress related to contact with toxic mold. Plaintiffs suffered special damages and will require ongoing testing/medical monitoring.

**COUNT VIII: Third-Party Beneficiary Contract**
**(against all Defendants)**

90. Plaintiffs incorporate the allegations set forth in paragraphs 1–44.

91. Defendants are bound by their contracts with the Air Force respecting MHPI housing at MacDill. Each of those contracts was entered into to further the goal of the MHPI to improve housing for service members.

92. The Operating Agreement originally entered into by AMC East, LLC

and the Air Force creating AMC contains language establishing that Plaintiffs were intended beneficiaries of Defendants' contractual obligations with respect to the provision of housing at MacDill. On information and belief, the current version of any Operating Agreement under which AMC presently operates continues to contain such or similar language.

93. On information and belief, the Ground Lease, entered into by the Air Force and AMC, also contains language indicating that Plaintiffs were intended beneficiaries.

94. On information and belief, property management agreements governing Defendants' property management practices at MacDill also contain provisions indicating that Plaintiffs were intended beneficiaries of those agreements.

95. Defendants and the Air Force intended to benefit the service members living at MacDill. MSgt Harvey is a servicemember living at MacDill with his family. The obligations to provide these intended benefits were included in the underlying contracts to ensure military service members, including Plaintiffs, would be provided with safe and habitable housing.

96. Defendants breached the requirements of the underlying contracts by failing to provide suitable management, maintenance, operations, and renovations of Plaintiffs' home.

97. Defendants also breached the duty of good faith and fair dealing implied in the contracts.

98. As a foreseeable result of the Defendants' breaches of the contracts,

Plaintiffs, who are intended, direct, third-party beneficiaries of such contracts, sustained damages.

**COUNT IX: Negligence Per Se**
**(against all Defendants)**

99. Plaintiffs incorporate the allegations set forth in paragraphs 1–44.

100. Defendants owed Plaintiffs a duty to take steps to protect them from the specific injuries outlined in this Complaint.

101. This duty was created by statutes specifically intended to protect Plaintiffs from those harms.

102. For example, section 19-231 of Tampa's Code of Ordinances states that, "No person shall occupy or let to another for occupancy or offer to let to another for occupancy any dwelling or dwelling unit which does not comply with the following standard." It then outlines a list of specific requirements intended to protect residents' health and safety. Defendants failed to comply with these requirements, including:

a) "*General condition of rental unit.* Each dwelling unit let or offered to let shall be clean, sanitary, fit for human habitation and in a good state of repair." Tampa Code of Ordinances § 19-231(17);

b) "Every floor, wall and ceiling shall be capable of affording privacy and shall be maintained in a good state of repair." *Id.* §19-231(10);

c) "*Plumbing fixtures and pipes.* Every plumbing fixture and water and waste pipe shall be maintained in good working condition, free from defects, leaks and obstructions." *Id.* § 19-231(13);

d) "*Kitchen and bathroom floors.* Floors in kitchens and bathrooms, except where constructed of materials impervious to moisture, shall be covered with asphalt, vinyl-plastic, rubber tile, ceramic tile, terrazzo or linoleum or other durable, waterproof, nonabsorptive material." *Id.* § 19-231(14)(a);

e) "*Flooring generally.* All other flooring throughout the dwelling shall be of approved grade and type of material properly installed." *Id.* § 19-231(14)(b).

103. Defendants also failed to comply with § 19-232, which provides that, "The owner shall be responsible for the repair and replacement of all plumbing facilities and equipment." *Id.* § 19-232(7).

104. Defendants also failed to comply with § 19-47, which provides that, "Nothing shall be allowable on the premises within the corporate limits of the city provided for in this chapter that shall in any way be offensive or noxious by reason of the emission of odors, gases, dust, smoke, light, vibration or noise … nor shall anything be constructed or maintained that would in any way constitute an eyesore or nuisance to adjacent property owners or residents or to the community." *Id.* § 19-47.

105. Plaintiffs are members of the class that each of the above statutes were designed to protect.

106. The statutes were intended to protect residents from the sorts of exposure-based injuries suffered by Plaintiffs and described in this Complaint.

107. Additionally, Florida Statutes § 386.03, § 386.051, and § 386.041 make it

unlawful to maintain a sanitary nuisance as defined in Florida Statute § 386.01 and any other applicable statutes, codes, and regulations governing the habitability of residential housing and the health and safety of occupants.

108. The violations of these statutes constitute negligence per se and were the proximate cause of Plaintiffs' injuries.

**COUNT X: Medical Monitoring**
**(against all Defendants)**

109. Plaintiffs incorporate the allegations set forth in paragraphs 1–44.

110. Plaintiffs suffered physical injuries when they were exposed to hazardous mold, as described in this Complaint.

111. As a result of their prolonged exposure to moisture-damaged indoor environments and associated microbial contamination, the Harvey family faces an increased and individualized risk of developing chronic and latent health conditions.

112. Members of the Harvey family experienced hospital visits, chronic pain, fatigue, brain fog, and other symptoms during the period of exposure and require ongoing medical evaluation and monitoring.

113. The Harvey children—Ad.H., Pa.H., Pr.H., and As.H.—as minor children whose immune and respiratory systems are still developing, face heightened long-term vulnerability from prolonged mold exposure, making early and ongoing monitoring critical.

114. MSgt and Mrs. Harvey likewise require ongoing evaluation and monitoring given the family's prolonged exposure to the conditions in the home.

115. The November 2025 independent testing—documenting mold in two HVAC supply plenums at approximately 200,000 and 280,000 spores per cubic meter, roughly 167 and 233 times the outdoor control and dominated by Penicillium/Aspergillus-type spores—together with the years of recurring leaks and visible growth, corroborates the Harvey family's exposures and informs the monitoring reasonably necessary for each Plaintiff according to contemporary scientific principles.

116. Early detection through monitoring is material because the chronic and latent conditions associated with Penicillium and Aspergillus exposure — including hypersensitivity pneumonitis, allergic sensitization, and immune-mediated inflammatory disease—may not manifest clinically for months or years after the exposure ends. The monitoring protocols required will differ for each Plaintiff based on their individual presentations, but each member of the Harvey family would benefit from regular evaluation.

117. The monitoring procedure would be unnecessary in the absence of Plaintiffs' exposure.

118. Given the exposure, monitoring regimes are reasonably necessary according to contemporary scientific principles.

119. Plaintiffs are entitled to the cost of medical monitoring necessary to detect the onset or worsening of physical harm and/or, in the alternative, that the court use its equitable powers to create and supervise a medical monitoring fund.

**COUNT XI: Unjust Enrichment**
**(against Defendant AMC)**

120. Plaintiffs incorporate the allegations set forth in paragraphs 1–44.

121. Plaintiffs conferred a benefit on AMC in the form of the BAH rent that the military transferred on their behalf. These funds belonged to Plaintiffs and were paid to AMC in return for safe and habitable housing at MacDill Air Force Base.

122. AMC failed to provide Plaintiffs with a safe and habitable home, and it failed to fully compensate Plaintiffs for the costs and inconvenience of their four separate displacements and the substantial damage to their personal property, ultimately failing to deliver the safe and habitable housing for which Plaintiffs' BAH was paid. It would be inequitable and unjust for AMC to retain the BAH funds provided by Plaintiffs.

123. Plaintiffs are entitled to restitution of some or all of the BAH funds paid to AMC.

**COUNT XII: Violation of Florida Deceptive and Unfair Trade Practices Act (FDUTPA) (Unfair Conduct)**
**(against all Defendants)**

124. Plaintiffs incorporate the allegations set forth in paragraphs 1–44.

125. The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful unfair methods of competition, unconscionable acts or practices, and unfair acts or practices in the conduct of any trade or commerce. FLA. STAT. § 501.204.

126. At all relevant times, Defendants solicited, advertised, offered, and/or provided goods, services, and/or property by leasing military housing at MacDill, and

by providing property management services relating to such military housing. Defendants were thereby engaged in trade or commerce within the meaning of the FDUTPA. FLA. STAT. § 501.203.

127. At all relevant times, Plaintiffs were consumers within the meaning of the FDUTPA. *Id.*

128. Defendants' practices relating to Plaintiffs' housing at MacDill, as described in detail in this Complaint, constituted unfair and/or unconscionable acts or practices within the meaning of the FDUTPA and thus violated the FDUTPA.

129. On information and belief, Defendants failed to follow their own policies and procedures relating to the treatment of harmful conditions, including policies and procedures for the treatment and remediation of mold.

130. Defendants' acts and practices exposed Plaintiffs to unsafe and unhealthy conditions, including toxic mold, structural defects, water leaks, and HVAC issues. These abhorrent conditions were known to Defendants.

131. Given those unconscionable conditions, Plaintiffs' interests in their MacDill home were only worth a small fraction of the rental payments for that home.

132. Defendants' acts and practices offended established public policy and were immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. As such, those acts and practices were unfair and unconscionable within the meaning of the FDUTPA and thus violated the FDUTPA.

133. As a result of Defendants' unfair and unconscionable acts or practices, Plaintiffs suffered losses and are entitled to recover actual damages, attorneys' fees,

and court costs. FLA. STAT.§ 501.211.

**COUNT XIII: Violation of Florida Deceptive and Unfair Trade Practices Act (FDUTPA) (Deceptive Conduct) (against all Defendants)**

134. Plaintiffs incorporate the allegations set forth in paragraphs 1–44.

135. The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful deceptive acts or practices in the conduct of any trade or commerce. FLA. STAT. § 501.204.

136. At all relevant times, Defendants solicited, advertised, offered, and/or provided goods, services, and/or property by leasing military housing at MacDill, and by providing property management services relating to such military housing. Defendants were thereby engaged in trade or commerce within the meaning of the FDUTPA, see *id., e.g.*, § 501.203.

137. At all relevant times, Plaintiffs were consumers within the meaning of the FDUTPA, *see id.*

138. Defendants' practices relating to Plaintiffs' housing at MacDill, as described in detail in this Complaint, constituted false, misleading, and/or deceptive acts or practices within the meaning of the FDUTPA and thus violated the FDUTPA.

139. On information and belief, AMC, as signatory to the lease, and all Defendants, through Harbor Bay's direct and ongoing communication with Plaintiffs, engaged in deceptive acts and practices, including the following:

(a) Defendants made false, misleading, and/or deceptive representations that Plaintiffs' MacDill home was in habitable condition and thus far

more valuable than it was in reality;

(b) the lease between Defendants and Plaintiffs, Defendants falsely warranted that Plaintiffs' housing was safe, habitable, and free from defects;

(c) Defendants failed to disclose information that they knew about the condition of Plaintiffs' housing with the intention of inducing Plaintiffs into leasing the home at a cost beyond what it was actually worth;

(d) once Plaintiffs discovered the unsafe and hazardous conditions in their home, Defendants falsely claimed that they would mitigate or fix those problems;

(e) Defendants made false, misleading, and/or deceptive representations that repairs and remediation efforts were performed completely and to the standard of care required of professional landlords; and

(f) Defendants failed to disclose the grossly inadequate nature of their repair and remediation efforts.

140. As a few examples, Defendants falsely (a) repeatedly closed recurring water-intrusion requests as "completed"; (b) minimized visible growth as "dust" or "mildew,"; and (c) painted over visible growth, concealing rather than investigating or repairing the hazard.

141. As a result of Defendants' deceptive acts or practices, Plaintiffs suffered losses and are entitled to recover actual damages, attorneys' fees, and court costs. FLA. STAT.§ 501.211.

142. Plaintiffs paid far more in rent than their home was actually worth.

143. Due to their role in the leasing and/or management and maintenance of the Plaintiffs' home at MacDill, Defendants were uniquely aware of the condition of Plaintiffs' home, maintenance history, defects in design, the need for repairs, remodeling, and remediation, and the existence of mold and other hazardous conditions.

144. As a result of Defendants' false, misleading, and deceptive acts or practices, Plaintiffs suffered losses and are entitled to recover actual damages, attorneys' fees, and court costs. *Id.* § 501.211.

**COUNT XIV: Negligent Misrepresentation**
**Concerning Condition of the Home**
**(against all Defendants)**

145. Plaintiffs incorporate the allegations set forth in paragraphs 1–44.

146. Plaintiffs' lease represented that, prior to moving in, their home was in safe, clean, and habitable condition, and free of mold, mildew, and signs of water intrusion. Defendants either knew or should have known that this was false at the time.

147. Defendants either knew that Plaintiffs' home was unsafe and unfit for human habitation, made representations concerning the safety and habitability of the home without knowledge of their truth or falsity, or should have known that such representations were false.

148. Defendants intended to convince Plaintiffs to sign a lease and move into their home based on these representations.

149. As reflected in the lease and, upon information and belief, its Addenda, Defendants represented that the home would be maintained free of mold and safe for occupancy. Defendants did not disclose the home's condition—including the foul

odor, animal droppings, and pest infestation evident upon move-in, and the recurring moisture and mold conditions that would follow—before the family accepted and occupied the residence.

150. Defendants knew or should have known that these statements would be material to the Plaintiffs' decisions to move into their home.

151. Plaintiffs justifiably relied on Defendants' assurances that their home was safe, mold free, and fit for human habitation at the time that they moved in.

152. As a direct and proximate result of Defendants' negligence, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require medical testing/monitoring, as well as severe mental and emotional distress related to those physical injuries.

**COUNT XV: Negligent Misrepresentation Concerning Repair and/or Remediation of Unsafe Conditions (against all Defendants)**

153. Plaintiffs incorporate the allegations set forth in paragraphs 1–44.

154. Once Plaintiffs discovered the unsafe and hazardous conditions in their home, Defendants, including via Harbor Bay, downplayed the severity of those problems in order to convince Plaintiffs to remain in their home.

155. Defendants falsely represented that hazardous and unsafe conditions, including mold and elevated indoor moisture, were innocuous or easily fixed conditions. Defendants knew or should have known that this was untrue.

156. Defendants falsely told Plaintiffs that there was no moisture in their home, when they knew or should have known that there was moisture.

157. When Plaintiffs requested that Defendants repair unsafe and hazardous conditions in their home, Defendants falsely claimed that they would take appropriate steps to mitigate or fix those problems. Defendants either knew that they would never take those steps, made the representations without knowledge of their truth or falsity, or should have known the representations were false.

158. On multiple occasions, Defendants claimed to have repaired an unsafe or hazardous condition, when they knew or should have known that they had not adequately done so.

159. Defendants intended to convince Plaintiffs to remain in their home or agree to continue their occupancy based on these false representations.

160. As a few examples, Defendants falsely (a) closed the family's recurring water-intrusion maintenance requests as "completed" without identifying or correcting the source; (b) minimized visible growth as "dust" or "mildew,"; and (c) concealed visible growth by painting over it rather than investigating or repairing it.

161. Defendants knew or should have known that these statements would be material to the Plaintiffs' decisions whether to remain in their home.

162. Plaintiffs justifiably relied on Defendants' assurances that they would take or had taken steps to make their home safe.

163. As a direct and proximate result of Defendants' negligence, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial damages, and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

**COUNT XVI: Fraudulent Inducement**
**(against all Defendants)**

164. Plaintiffs incorporate the allegations set forth in paragraphs 1–44.

165. Defendants deliberately, willfully, and knowingly made false and material statements regarding the habitability and safety of Plaintiffs' housing as described in detail in this Complaint in order to induce Plaintiffs to sign a lease and move into their home.

166. Plaintiffs' lease, and upon information and belief, the lease's Addenda represented that, prior to moving in, their home was in safe, clean, and habitable condition, and free of mold, mildew, and signs of water intrusion. Defendants either knew or should have known that this was false at the time.

167. These representations were material to Plaintiffs' decisions to enter into their lease causing Plaintiffs' BAH to be paid to Defendants.

168. Plaintiffs lease, and upon information and belief, its Addenda, represented that the home would be maintained free of mold and safe for occupancy. Defendants did not disclose the home's condition—including the foul odor, animal droppings, and pest infestation evident upon move-in, and the recurring moisture and mold conditions that would follow—before the family accepted and occupied the residence.

169. Plaintiffs relied on Defendants' assurances that their home was safe and fit for human habitation at the time that they moved in.

170. Defendants knew or reasonably should have known that these statements, including the representations in the lease, were false. But for the Defendants'

false statements, Plaintiffs would not have signed the lease or moved into their home.

171. As a direct and proximate result of Defendants' fraudulent inducement, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require ongoing medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

**COUNT XVII: Fraudulent Misrepresentation Concerning Repair and/or Remediation of Unsafe Conditions (against all Defendants)**

172. Plaintiffs incorporate the allegations set forth in paragraphs 1–44.

173. Defendants, including via Harbor Bay, deliberately and willfully made false and material statements regarding the habitability and safety of the Plaintiffs' housing, in order to cause Plaintiffs to remain in their home notwithstanding the unsanitary and dangerous conditions in it.

174. Defendants made false statements to Plaintiffs that their home was suitable for habitation throughout the course of Plaintiffs' residence in the home.

175. Once Plaintiffs discovered the unsafe and hazardous conditions in their home, Defendants consistently, deliberately, and falsely downplayed the severity of those problems. Defendants knew the true severity of those conditions, having themselves inspected and performed repair work at the home.

176. When Plaintiffs persisted in demanding that Defendants repair unsafe and hazardous conditions in their home, Defendants falsely claimed that they would take steps to mitigate or fix those problems. Defendants knew that they would never do so, as demonstrated by their repeated pattern of performing only cosmetic or

temporary repairs instead of addressing the underlying HVAC and moisture defects.

177. Defendants claimed to have repaired an unsafe or hazardous condition, when Defendants knew that they had not adequately done so.

178. As a few examples, Defendants falsely (a) repeatedly closed the family's recurring water-intrusion maintenance requests as "completed" without identifying or correcting the source; and (b) minimized visible growth as "dust" or "mildew,"; and (c) painted over visible growth, concealing rather than investigating or repairing the hazard.

179. Defendants knew that the statements concerning the condition and maintenance of the home and the promised remediation were false.

180. Plaintiffs justifiably relied on Defendants' assurances that they would take or had taken steps to make their home safe.

181. These representations were material to Plaintiffs' decisions to remain in their home.

182. But for Defendants' false statements, Plaintiffs would not have remained in their home.

183. As a direct and proximate result of Defendants' fraudulent misrepresentation, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

**COUNT XVIII: Fraudulent Concealment of Condition of Housing (against all Defendants)**

184. Plaintiffs incorporate the allegations set forth in paragraphs 1–44.

185. Defendants deliberately, willfully, and actively concealed material facts regarding the habitability and safety of the Plaintiffs' housing in order to cause Plaintiffs to sign a lease and move into their home.

186. Plaintiffs' lease and, upon information and belief, lease Addenda, represented that, prior to moving in, their home was in safe, clean, and habitable condition, and free of mold, mildew, and signs of water intrusion. Defendants either knew or should have known that this was false at the time.

187. Defendants, as lessors and landlords and/or as the agents of the lessors and landlords, owed Plaintiffs a duty to disclose their knowledge of hazardous and unsafe conditions in their home.

188. Additionally, Defendants had knowledge of the defects in the home or were better positioned to discover such defects and therefore had a duty to disclose those material facts to Plaintiffs and failed to do so.

189. Defendants knew or reasonably should have known that the concealed or omitted facts were material to Plaintiffs' decisions to sign a lease and move into their home and should have been disclosed.

190. Defendants knew that their concealments would induce Plaintiffs to act.

191. Plaintiffs relied on Defendants' concealments and omissions.

192. But for the Defendants' fraudulent concealments and material omissions,

Plaintiffs would not have signed the lease or moved into their home.

193. As a direct and proximate result of Defendants' fraudulent concealment, Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

**COUNT XIX: Fraudulent Concealment Concerning Repair and/or Remediation of Unsafe Conditions (against all Defendants)**

194. Plaintiffs incorporate the allegations set forth in paragraphs 1–44.

195. Defendants, including through Harbor Bay, deliberately, willfully, and actively concealed material facts regarding the habitability and safety of Plaintiffs' housing in order to cause Plaintiffs to remain in their home.

196. Defendants, as lessors and landlords and/or as the agents of the lessors and landlords, owed Plaintiffs a duty to disclose their knowledge of continuing hazardous and unsafe conditions in their home.

197. Additionally, Defendants had knowledge of the defects in the home or were better positioned to discover such defects and therefore had a duty to disclose those material facts to Plaintiffs and failed to do so.

198. As a few examples, Defendants falsely (a) repeatedly closed the family's recurring water-intrusion maintenance requests as "completed" without identifying or correcting the source; and (b) minimized visible growth as "dust" or "mildew,"; and (c) concealed visible growth by painting over it rather than investigating or repairing it.

199. Defendants fraudulently concealed ongoing dangers in the home by engaging in cosmetic repairs that disguised the continuing hazardous and unsafe conditions while telling Plaintiffs that repairs had been successfully completed.

200. Defendants knew or reasonably should have known that the concealed or omitted facts were material to Plaintiffs' decisions to remain in their home and should have been disclosed.

201. Defendants knew that their concealment or omission would induce the Plaintiffs to act or refrain from acting.

202. Plaintiffs relied on Defendants' concealments and omissions.

203. But for the Defendants' fraudulent concealments and material omissions, Plaintiffs would not have remained in their home.

204. As a direct and proximate result of Defendants' fraudulent concealment, the Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

## DAMAGES

As a result of the Defendants' breaches, negligence, gross negligence, fraud, and other acts and omissions described in this Complaint, Plaintiffs have sustained damages and injuries and are entitled to recover damages related to the following, including but not limited to:

a. Past and future physical pain and suffering;

b. Past and future mental anguish and emotional distress;

c. Past and future medical, healthcare, and attendant care expenses;

d. Past and future lost income and earning capacity;

e. Past and future physical impairment;

f. Past and future loss of enjoyment and quality of life;

g. Past and future loss of enjoyment of property;

h. Increased risk of future harm and medical monitoring for life;

i. Loss of life expectancy;

j. Nuisance damages, including inconvenience, illness, and fear;

k. Out of pocket expenses;

l. Loss of and/or damage to personal property;

m. Costs, expenses, and fees, including attorneys' fees; and

n. Punitive damages.

**PRAYER FOR RELIEF**

Plaintiffs pray that this Court:

A. Award the Plaintiffs compensatory damages, in an amount to be determined at trial;

B. Award punitive damages as appropriate, including for counts III, V, VI, VII, IX, XIV, XV, XVI, XVII, XVIII, XIX, in an amount to be determined at trial;

C. Award the Plaintiffs pre-judgment and post-judgment interest and any other costs, expenses, or fees, including attorneys' fees, to which they may be entitled by law, and;

D. Grant the Plaintiffs such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury for all issues so triable.

DATED: September 4, 2026.

Respectfully submitted,

/s/ Robert J. McKee
Robert J. McKee
Florida Bar No.: 972614
THE MCKEE LAW GROUP, LLC
2800 South Flamingo Road
Davie, Florida 33330
Tel: (954) 888-9877
Fax: (954) 217-0150
Email: rmckee@themckeelawgroup.com
*Lead Counsel*

Vincent J. Colatriano*
Michael Weitzner*
COOPER & KIRK, PLLC
1523 New Hampshire Ave. NW
Washington, D.C. 20036
Tel: 202-220-9600
Fax: 202-220-9601
Email: vcolatriano@cooperkirk.com
Email: mweitzner@cooperkirk.com

Kristina Baehr*
**JUST WELL LAW, PLLC**
1809 Pearl Street
Austin, Texas 78701
Tel: (512) 693-8029
Email: Kristina@well.law
Email: Militaryhousing-lit_PLslistserv@well.law

**Pro Hac Vice forthcoming*

*Attorney for Plaintiffs*